## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SANDRA RATHBONE,      :
            :
  Plaintiff,      :
            :
 v.          :  No. 3:03CV1478(DJS)
            :
CVS PHARMACY, INC. and    :
PLAINFIELD CVS PHARMACY, INC.; :
            :
  Defendants.     :

### MEMORANDUM OF DECISION

On August 29, 2003, plaintiff Sandra Rathbone
("Rathbone") filed this action alleging that her employer,
CVS Pharmacy, Inc. and Plainfield CVS Pharmacy, Inc.
(collectively "defendants" or "CVS") discriminated against
her because of her pregnancy and maternity leave in
violation of Title VII of the Civil Rights Act of 1964.  42
U.S.C. §§ 2000e et seq.; the Connecticut Fair Employment
Practices Act, Conn. Gen. Stat. § 46a-60(a) et seq.; and the
Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2612, et
seq.  Rathbone also brings the common law claim of negligent
infliction of emotional distress.  On January 21, 2005,
pursuant to Rule 56(b) of the Federal Rules of Civil
Procedure, defendants filed a motion for summary judgment.
(Dkt. # 52.)  For the reasons set forth herein, defendants'
motion is **DENIED.**

## I. FACTS

On May 2, 1989, CVS hired plaintiff Sandra Rathbone as an assistant manager.  She held this position for approximately eighteen months, working at a variety of stores and under several managers.  Each time that she was assigned to a new store, her responsibilities increased.  In December 1990, CVS promoted Rathbone to Store Manager of the Glastonbury CVS.  She was responsible for running the store; scheduling of staff; ordering promotions; handling customers, employees, and pharmacy staff; and enforcing CVS policies.  In 1991, CVS named Rathbone manager of the year and identified her as one of the top reasons why her region was so successful.

In 1995, CVS transferred Rathbone to the Plainfield CVS, a store that had significant challenges.  Rathbone turned the store around in six months.  In 1998, Rathbone became Store Manager and remained there for the remainder of her tenure.  During this time, based on her store's success, Rathbone received incentive awards.  In spring of 2001, District Manager Christine Casella gave Rathbone the responsibility of training CVS assistant managers.  Because of her good performance as a manager and low employee turnover, in June of 2001, defendants asked Rathbone to

-2-

provide a seminar on employee retention.  During her employment with CVS, Rathbone's evaluations were consistently positive.

On April 30, 2001, Rathbone informed District Manager Casella that she was pregnant with her second child.  She alleges that defendants were not pleased with her pregnancy. Rathbone states that she was limited physically because of the pregnancy.  Also, based on the date she expected to deliver the child— November of 2, 2001— Rathbone anticipated taking medical leave during the holiday season, which would leave the Plainfield store without a manager during the defendants' busiest season.

According to Rathbone, between April and September 2001, Casella made several negative comments regarding her pregnancy.  Specifically, Rathbone claims that Casella commented that Rathbone had "planned [her] pregnancy perfect so that [she] wouldn't have to move merchandise around during the Christmas season."  (Dkt. # 52, Reed Aff., Ex. A at 257:1-3.)  Rathbone also contends that, in a regional meeting, Casella pointed out that Rathbone was not certified in the photo lab— something required of managers— but neglected to mention that Rathbone could not obtain certification during her pregnancy because of a risk to the

-3-

fetus.  Thus, according to Rathbone, Casella's comments
reflected defendants' hostility to Rathbone's pregnancy and
created the impression that Rathbone was shirking her duties
because of her pregnancy.

Rathbone developed complications with her pregnancy
and, on or about September 15, 2001, left work on Family and
Medical Leave.  CVS approved Rathbone's leave of absence
from September 15 through December 15, 2001.  In early
November 2001, Rathbone called Casella to request an
extension of her leave until January 2, 2002 or to take her
vacation time consecutive with her leave since, according to
Rathbone, CVS allows its employees to take their accrued
vacation time consecutive with their leave time.

On November 1, 2001, Rathbone gave birth to her
daughter.  Rathbone called Casella periodically to keep her
updated about the status of her leave.  In one of these
November calls, when discussing her pregnancy or leave,
Rathbone claims that Casella said, "Boy, you couldn't have
planned that any better." (Dkt. # 52, Reed Aff., Ex. A at
259:8-9.)  On December 4, 2001, Rathbone claims that she
received a floral arrangement from the defendants.  Attached
to the floral arrangement, Rathbone claims, was a card that
stated, "Congratulations on your addition to your family.

Have a good life, CVS, 11/25."  (Dkt. # 61 Ex. 1 at 358:21-22.)  Rathbone claims that she found this card to be odd and discarded it.

While Rathbone was on leave, Casella started an investigation into Rathbone's conduct.  Defendants suggest that complaints by Rathbone's subordinates led to the investigation.  According to defendants, shift supervisor Renee Turcotte approached Casella and submitted a letter dated October 9, 2001, which contained various complaints about Rathbone.  The letter criticized Rathbone for the manner in which she assigned shifts, for purported favoritism with respect to employee Sandy Tweedie, for requiring Turcotte and her mother (also a store employee) to work in different stores to keep full-time hours, and for taking Tweedie out to lunch for over an hour to give her a performance evaluation, but only requiring Tweedie to punch out for a half an hour.

After receiving the letter, Casella contacted Dave Sabo, from CVS Human Resources, to conduct an investigation.  According to Rathbone, Sabo did not investigate the specific allegations in Turcotte's letter and instead conducted a "morale survey" of the store by interviewing employees.  Defendants claim that from these interviews they learned

-5-

that Rathbone frequently applied coupons for items that were not covered.  Also, that Rathbone wrote herself rainchecks and kept merchandise off the sales floor, so she could purchase the items once they were marked down. Rathbone, however, alleges that Sabo's interview notes do not reflect these accusations.

After Sabo's investigation, Casella contacted Michael Clay, CVS Loss Prevention Manager, to conduct another investigation.  Casella reported that there were concerns about Rathbone possibly holding merchandise off the floor, misusing coupons and rainchecks, and falsifying time cards. CVS has a Loss Prevention Policy and Procedure Manual, which detailed how Clay was to conduct his investigation. According to this policy manual, Clay was to create a Report of Investigation, which he did not.  He also does not recall whom he interviewed.  Rathbone claims that his investigation consisted mostly of reviewing the employee complaint letters, reviewing the rainchecks Casella provided, talking with Casella, and interviewing Rathbone.

On January 2, 2002, when Rathbone returned from her leave, Casella and Clay requested to meet with her.  Clay asked Rathbone questions regarding rainchecks, coupons, and holding merchandise off the floor.  He also asked her

-6-

questions regarding Tweedie's performance review.  According to Rathbone, with respect to rainchecks, she admitted that she used rainchecks and sometimes the rainchecks were old. With respect to using coupons, she explained that if the store was out of the exact item, she would on occasion substitute the same brand in a different size.  As for holding merchandise off the floor, Rathbone informed Clay that, at least on one occasion, she put diapers aside to buy them at the end of her shift.  Rathbone also explained that, when she took Tweedie out to lunch for an employment performance review, she asked her to clock out the half an hour used to eat lunch.

At the end of the interview, Clay asked Rathbone to complete a written statement about their conversation. According to Rathbone, Clay asked her to rewrite the statement because it was too favorable to her.  Rathbone complied because she thought her job was in jeopardy.  Her statement read as follows:

> I Sandra Rathbone was approached by Michael Clay in regard to coupons, rainchecks, holding merchandise and taking a shift supervisor out to lunch for her performance review.
>
> Coupon[s] were used about 5 times on wrong size items, Example [i]f I purchased Colgate toothpaste 4.6 oz, I used coupon for 6.4oz Colgate toothpaste item.

-7-

Rainchecks were retained and used for longer than
a yr.

Merchandise was held and then later purchased.

Lunch with Shift Supervisors Review was an hour.
Time clock reflected a 1/2 hour lunch as being
taken.

I Sandra Rathbone feel that the Baseline Practices
should have been followed 100%.  I am aware as to
set an example to employees I should follow policy
[and] procedures in accordance with CVS.

(Dkt. # 60, Ex. 22.)  After completing the written

statement, Casella told her that she was suspended pending

an investigation.  Rathbone, however, claims that defendants

did not continue the investigation.  In fact, she claims

that Clay did not meet with any additional witnesses, did

not create a report, and could not identify any additional

steps that he took after meeting with Rathbone.

According to defendants, after the investigation,

Casella contacted her regional manager and recommended

Rathbone's termination.  On January 15, 2002, he approved

the decision, and following the approval, Casella called

Rathbone and informed her that CVS had terminated her

employment. Nevertheless, Rathbone notes that, on December

30, 2001, while Rathbone was still on leave, defendants

effectively terminated her and promoted Bill Bartoli, who

had been transferred to the Plainfield store as an assistant

-8-

manager during Rathbone's pregnancy in June of 2001 to Store Manager of the Plainfield store. (Dkt. # 60 Ex. 20.)

Rathbone explains that, while she did most of the things included in her statement, her actions did not violate defendants' policies and practices.  CVS raincheck policies instruct employees that they may offer an item substitution or a raincheck when a customer wishes to purchase an out of stock item.  Rainchecks do not expire, and the cashier must manually enter the raincheck and coupon information.  Furthermore, coupons are to be accepted if (1) it matches the item being purchased; (2) the expiration date is valid; (3) the coupon value is less than or equal to the item being purchased; and (4) redemption information is provided.  Rathbone claims that in determining whether a coupon "matches" the item being purchased, an exact match is not required.  For example, when the exact matching item is not in stock, a customer may use a coupon for a different size item in the same brand.  (Dkt. # 60 at 21-23.)  As to setting merchandise aside for purchase at the end of the shift, Rathbone claims that this is a permitted practice because Sabo engages in the same practice, and Casella has also permitted the setting aside of merchandise.

-9-

## II. DISCUSSION

Rathbone claims that, in violation of Title VII of the Civil Rights Acts of 1964 and the Connecticut Fair Employment Practices Act ("CFEPA"), defendants terminated her employment because of her pregnancy.  In addition, Rathbone claims that defendants violated the FMLA's prohibition against retaliation by terminating her for exercising her right to take leave.  Rathbone also alleges negligent infliction of emotional distress.  Because defendants have not shown that they are entitled to summary judgment, their motion is denied.

### A. STANDARD OF REVIEW

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is not genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burdens of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of

any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

## B. DISCRIMINATION CLAIM

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against its employees because of an employee's sex.[1]  42 U.S.C. § 2000e-2(a)(1).  Sex discrimination includes discrimination

---

[1] Because the Connecticut Supreme Court looks to federal precedent for interpreting and enforcing CFEPA, the court's employment discrimination analysis applies to both CFEPA and Title VII.  See Levy v. Comission of Human Rights and Opportunities, 671 A.2d 349, 355 (Conn. 1996).

because of pregnancy, childbirth, or related medical conditions.  See 42 U.S.C. § 2000e(k).  Title VII provides that pregnant women "shall be treated the same for all employment related purposes."  Id.  The CFEPA likewise makes it unlawful for employers to discriminate against their employees because of pregnancy.  Conn. Gen. Stat. § 46a-60(a)(7).

One way to prove pregnancy discrimination is for the plaintiff to introduce circumstantial evidence by way of the burden-shifting framework established in McDonnell Douglass Corp. v. Green, 411 U.S. 792 (1973), and its progeny. Teahan v. Metro-North Commuter Railroad Co., 951 F.2d 511, 514 (2d Cir. 1991); Levy v. CHRO, 236 Conn. 9, 103 (1996). Specifically, plaintiff must initially prove a prima facie case of pregnancy discrimination by demonstrating that she suffered an adverse employment action under circumstances supporting a reasonable inference of discrimination.  See Patterson v. County of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004).  To establish a prima facie case of pregnancy discrimination, plaintiff must prove that (1) she was pregnant; (2) she was qualified for position that she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances

-12-

giving rise to an inference of pregnancy discrimination.
See Patterson, 375 F.3d at 221; Schnabel v. Abramson, 232
F.3d 87, 87 (2d Cir. 2000).  Plaintiff's burden in this
regard has been described as "minimal."  Zimmerman v.
Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir.
2001).  Indeed, "the mere fact that a plaintiff was replaced
by someone outside the protected class will suffice for the
required inference of discrimination at the prima facie
stage of Title VII analysis."  Id.

     If the plaintiff is able to establish the elements of
her prima facie case, a presumption arises that the employer
unlawfully discriminated against her, and the burden shifts
to the employer to articulate a legitimate, non-
discriminatory reason for the adverse action, which, if
believed by a jury, would support a finding of unlawful
discrimination.  See id.; Stern v. Trustees of Columbia
University, 131 F.3d 305, 312 (2d Cir. 1997).  The reason
provided must be both "clear and specific."  Meiri v. Dacon,
759 F.2d 989, 997 (2d Cir. 1985).  The defendant's burden at
this stage is one of production only; the defendant is not
required to prove that its stated reason actually motivated
its actions.  The burden of persuasion rests, at all times,
with the plaintiff to prove that she was discriminated

against because of her pregnancy.  Zimmerman, 251 F.3d at

381; Farias v. Instructional Systems, Inc., 259. F.3d 91, 98

(2d Cir. 2001).

Once the employer has articulated a legitimate non-

discriminatory reason for the adverse employment action, the

presumption dissipates and the burden shifts back to the

plaintiff to prove by a preponderance of the evidence that

"the legitimate reasons offered by the defendant were not

its true reasons, but were a pretext for discrimination."

Patterson, 375 F.3d at 221.  In order to avoid summary

judgment at this stage, the plaintiff must show that there

is sufficient evidence to permit a rational jury to infer

that the employer's stated reason is a pretext for

discrimination.  Conclusory and substantially unsupported

assertions of pretext are inadequate in this regard. See id.

(citing Smith v. American Express Co., 853 F.2d 151, 154-55

(2d Cir. 1988)).  To meet this burden, the plaintiff may

rely "on the evidence constituting the prima facie case,

together with supportable inference to be drawn from the

false or erroneous character of the employer's proffered

reason for the adverse action."  Carlton v. Mystic

Transportation, Inc., 202 F.3d 129, 135 (2d Cir. 2000); see

also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.

133, 142 (2000); <u>Aka v. Washington Hosp. Ctr.</u>, 156 F.3d 1284, 1292-93 (D.C. Cir. 1998).  The plaintiff is not required to prove that the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision, but only that any lawful motives were not the only reasons and that the plaintiff's protected status contributed to the employer's decision.  <u>See</u> <u>Holtz v. Rockerfeller & Co.</u>, 258 F.3d 62, 78-79 (2d Cir. 2001); <u>Renz v. Grey Advertising, Inc.</u>, 135 F.3d 217, 220-222 (2d Cir. 1997); <u>Cronin v. Aetna</u>, 46 F.3d 196, 203 (2d Cir. 1995).

Whether a plaintiff met her ultimate burden of proving discrimination should be determined on a case-specific approach upon consideration of a number of factors, including the strength of the <u>prima facie</u> case, the probative value of any proof that the employer's stated reason for the adverse employment action is false, and any other evidence that supports the employee's case and properly may be considered on a motion for judgment as a matter of law.  <u>See</u> <u>Zimmerman</u>, 2451 F.3d at 381 (citing <u>Reeves</u>, 530 U.S. at 148-49). Proof that the employer's proffered reason for the adverse employment action is unworthy of belief constitutes "circumstantial evidence that

is probative of intentional discrimination." <u>Reeves</u>, 530
U.S. at 147.  Evidence that the employer's reason is false,
combined with the <u>prima</u> <u>facie</u> case, could be sufficient to
allow the issue to go to the jury.  <u>See</u> <u>Reeves</u>, 530 U.S. at
148.  Summary judgment may be granted if the record reveals
conclusively that there was "some other non-discriminatory
reason for the employer's decision [or] the plaintiff
created only a weak issue of fact as to whether the
employer's reason was untrue, and there was abundant and un-
contradicted evidence that no discrimination had occurred."
<u>Reeves</u>, 530 U.S. at 148.

Both parties have met their respective preliminary
burdens with respect to the pregnancy discrimination claim.
Rathbone has demonstrated a <u>prima</u> <u>facie</u> case of pregnancy
discrimination, and defendants concede that she has done so.
(Dkt. # 52 at 7.)  Defendants have also met their burden by
offering a non-discriminatory reason for Rathbone's
discharge.  Defendants have met their obligation by stating
that they terminated Rathbone because of gross violations of
company policies including (1) using old rainchecks; (2)
improper use of coupons by purchasing items of a different
size; (3) paying an employee for time spent at lunch; and
(4) keeping merchandise off the floor for her own benefit.

This offer of proof is sufficient to meet defendant's burden at this stage in the analysis.  See Reeves, 530 U.S. at 142.

The burden, therefore, shifts to Rathbone to prove that the defendants' proffered reasons are not true and that the true reason for its action was unlawful discrimination.  A jury may find in favor of Rathbone because she may be able to show that defendants decided to terminate her because of her pregnancy and not because of Rathbone's alleged transgressions.  Rathbone may be able to prove that (1) CVS does not have a policy against using old rainchecks, and that in fact, CVS does not even have an expiration date on rainchecks; (2) CVS does not have a policy against using coupons to purchase items of a different size other than the size specified in the coupon; (3) she did not violate CVS policy by having an employee deduct her lunch time when she conducted an employee review during lunch; and (4) she did not violate CVS policy by setting items aside to purchase at the end of her shift because CVS does not oppose this behavior.

Further, the evidence could show that Casella, Rathbone's direct supervisor and the person who recommended her termination, made repeated comments about the timing of Rathbone's pregnancy leave, suggesting that Rathbone had

"timed" her pregnancy conveniently to avoid the work during
the Christmas season.  A jury could reasonably find that
these comments show hostility towards Rathbone's pregnancy,
and therefore, the trier of fact could infer that Casella
recommended Rathbone's dismissal because of her pregnancy.

Defendants, however, alleged that these comments are
merely "stray remarks" and thus cannot prove discrimination.
Generally, stray remarks of a decision-maker, absent some
nexus between the alleged comments and the adverse action,
cannot prove a claim of employment discrimination. See Abdu-
Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir.
2001).  To determine whether a comment is a probative
statement evidencing an intent to discriminate or a
nonprobative "stray remark," courts consider the following
factors: "'(1) who made the remark, i.e., a decisionmaker, a
supervisor, or a low-level coworker; (2) when the remark was
made in relation to the employment decision at issue; (3)
the content of the remark, i.e., whether a reasonable juror
could view the remark as discriminatory; and (4) the context
in which the remark was made, i.e., whether it was related
to the decision making process.'"  Young v. Pitney Bowes,
Inc., No. 3:03CV1161 (PCD), 2006 U.S. Dist. LEXIS 20788, at
*59 (D. Conn. Mar. 21, 2006) (quoting Schreiber v. Worldco,

LLC, 324 F. Supp. 2d 512, 518-19 (S.D.N.Y. 2002)).  Stray remarks, therefore, "bear a more ominous significance when considered with the totality of the evidence."  Carlton, 202 F.3d at 136 (quoting Danzer, 151 F.3d at 56).

Rathbone may be able to establish a nexus between the alleged comments and the adverse action taken against her because the statements were made by the decision maker, Casella, specifically about Rathbone, and the remarks were made relatively close in time to Rathbone's leave and termination.  A reasonable juror could therefore view the remarks as discriminatory because the context in which the remarks were made support the conclusion that they were related to the decision to terminate her employment. In addition, Rathbone has presented evidence that tends to show that the remarks were part of a sequence of events culminating in her discharge.  See Danzer v. Norden Sys., Inc., 151 F.3d 50, 55-6 (2d Cir. 1998).  This evidence suffices to link the offensive comments to Rathbone's termination.  Id.

Defendants have failed to show that a genuine issue of fact does not exist with respect to Rathbone's discrimination claims.  Accordingly, summary judgment is denied as to this claim.

C. FMLA RETALIATION CLAIM

Defendants argue that Rathbone's FMLA claim fails as a matter of law.  The FMLA provides covered employees with certain substantive rights to unpaid leave.  Specifically, the FMLA entitles a covered employee to twelve weeks of unpaid leave in any twelve-month period to give birth or care for one's child, or to adopt a child; to care for a seriously ill spouse, child, or parent; or to address a person's own serious health condition that renders an individual unable to perform the functions of his or her job.  See 29 U.S.C. § 2612(a)(1).  When an employee, who is eligible for leave under the FMLA, takes leave under the Act, he or she is entitled, upon his or her return, to be restored to the same or an equivalent position to the one held before the leave commenced.  See 29 U.S.C. § 2614(a)(1).  The FMLA prohibits an employer from interfering with, restraining, or denying an employee's exercise of any rights under the Act, and from retaliating against an employee for exercising a protected right under the Act.  See 29 U.S.C. § 2615(a); Morgan v. Hilti, Inc., 108 F.3d 1319, 1325 (10th Cir. 1997).

A claim of retaliation requires the employee to show that he or she was discharged as a result of exercising the

-20-

rights granted by the FMLA.  See Potenza v. City of New
York, 354 F.3d 165, 168 (2d Cir. 2004).  A retaliation claim
pursuant to the FMLA is akin to retaliation claims under
Title VII and the ADEA, and the Second Circuit has adopted
the McDonnell Douglas analytical framework for these claims.
See id. at 168; Hodgens, 144 F.3d at 160.

In order to prevail on her retaliation claim, Rathbone
must establish a prima facie case by showing that (1) she
availed herself of a protected right under the FMLA; (2) she
was qualified to hold the store manager position; (3) she
was adversely affected by an employment decision; and (4)
the adverse employment action occurred under circumstances
giving rise to an inference of retaliatory intent.  See
Potenza, 354 F.3d at 168.  As with Title VII, if Rathbone is
able to establish a prima facie case, defendants must
articulate a legitimate, non-retaliatory reason for the
adverse job action.  See Patterson, 375 F.3d at 221.  Once
they do so, Rathbone has the burden of proving that
defendants' stated reason was pretext for unlawful
retaliation under the FMLA.  Id.

For the same reasons that defendant's summary judgment
motion on Rathbone's sex discrimination claim was denied,
defendant's summary judgment motion for Rathbone's FMLA

retaliation claim is also denied.  See, infra, Section II.
B.  In sum, Rathbone may be able to prove that defendants
decided to terminate her because of her pregnancy leave and
not because of Rathbone's alleged policy infractions.

### D. NEGLIGENT INFLICTION OF EMOTION DISTRESS

Defendants claim that Rathbone's negligent infliction
of emotional distress claim fails as a matter of law.  A
plaintiff may maintain an action for negligent infliction of
emotional distress if the defendant engaged in conduct that
the defendant knew or reasonably should have known would
involve an unreasonable risk of causing the plaintiff
emotional distress.  See Montinieri v. Southern New England
Telephone Co., 175 Conn. 337, 345 (1978).  The Connecticut
Supreme Court has further held that claims of negligent
infliction of emotional distress arising from conduct
occurring within the termination of employment are
actionable, but with the limitation that mere termination,
even if wrongful, is not sufficient basis for the claim.
See Perodeau v. City of Hartford, 259 Conn. 729, 736 (2002).
To be unreasonable, conduct need not be outrageous, but must
simply involve more than "bad manners" or "minor
annoyances."  Montinieri, 175 Conn. at 354.

Rathbone may be able to prove that defendants are

-22-

liable for negligent infliction of emotional distress, because she may be able to show that the way she was terminated was unreasonable and humiliating, and that such conduct is the type of conduct that would have caused Rathbone to suffer emotional distress. Defendants have not shown that there is not a genuine issue of fact for trial with respect to Rathbone's negligent infliction of emotional distress; therefore, summary judgment on this claim is denied.

### III. CONCLUSION

For the foregoing reasons defendant's motion for summary judgment (dot. # 52) is **DENIED**. The parties shall file a joint trial memorandum on or before September 8, 2006.

So ordered this 12th day of May, 2006.

**/s/DJS**
_____
        **DOMINIC J. SQUATRITO**
    **UNITED STATES DISTRICT JUDGE**